## IN THE SUPREME COURT OF THE STATE OF IDAHO
### Docket No. 25688

STATE OF IDAHO,                                )
                                               )
          Plaintiff-Respondent,                )          **Boise, April 2008 Term**
                                               )
v.                                             )          **2008 Opinion No. 98**
                                               )
EDWARD JOHN STEVENS,                           )          **Filed: July 23, 2008**
                                               )
          Defendant-Appellant.                 )          **Stephen W. Kenyon, Clerk**
                                               )
                                               )
                                               )

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County.  Hon. Daniel T. Eismann, District Judge.

Judgment and conviction for first-degree murder, <u>affirmed.</u>

Molly J. Huskey, State Appellate Public Defender, Boise, for appellant.  Jason Curtis Pintler, Deputy Public Defender argued.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent.  Kenneth K. Jorgensen, Deputy Attorney General argued.

———————————————————

BURDICK, Justice

Appellant Edward Stevens appeals from his conviction for first-degree murder and the denial of his motion for a new trial.  We affirm.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Eleven month old Casey Whiteside died on December 27, 1996, from a fatal head injury.  Stevens, Casey's mother's boyfriend, was caring for him at the time Casey sustained the head injury.  Stevens was charged with murder in the first degree for killing Casey during the course of committing aggravated battery.  Although Stevens claimed that he fell asleep and awoke to find Casey unresponsive on the hardwood floor at the bottom of the stairs in the home, the State argued that Stevens violently shook Casey and slammed Casey's head into the edge of a bathtub causing a massive and fatal head injury.

1

Stevens's first trial resulted in a mistrial after the jury could not return a verdict. The jury in Stevens's second trial found him guilty. At that trial, both the State and the defense presented expert witnesses to support their theories of the case. One of the State's experts, Saami Shaibani, used a videotape of computer generated objects falling down stairs to illustrate his testimony that Casey could not have received his injuries from such a fall down stairs. Although the defense objected to the introduction of this video, the district court denied its motion. Additionally, evidence was presented that Casey was taking the reflux drug Propulsid and an antibiotic at the time of his death, and that injuries to Casey's eyes were indicative of shaken baby syndrome.

After his conviction, Stevens appealed to this Court. However, prior to oral argument Stevens moved for a new trial based on newly discovered evidence, and his appeal was suspended pending the district court's decision on that motion. The district court denied Stevens's motion for a new trial, and Stevens filed additional briefs with this Court, withdrawing his earlier arguments.

## II. ANALYSIS

Stevens first argues that the district court erred when it admitted a videotape into evidence for illustrative purposes, as the tape was not illustrative and if it was, it was irrelevant and more prejudicial than probative. Stevens also argues that the district court erred in denying his motion for a new trial. Finally, he argues the district court abused its discretion when it imposed a life sentence for his first offense because the district court made findings of fact beyond those of the jury, because it failed to give adequate weight to mitigating factors, and because it violated Stevens's rights by considering that he maintained his innocence as a factor when examining his rehabilitative potential. We will first discuss the admission of the videotape, and then the motion for a new trial before turning to Stevens's sentence.

### A. The district court did not err in admitting the videotape for illustrative purposes.

Prior to trial, the State notified Stevens that it intended to introduce an animated video to illustrate Shaibani's testimony. The defense objected and the district court reserved ruling on the motion until trial. At trial, the State moved to introduce the video, and Stevens objected. The district court ruled that the video was admissible for illustrative purposes, and immediately gave the jury a limiting instruction that the video was simply evidence used to illustrate Shaibani's testimony.

The video consisted of four different objects falling down stairs. The fourth object was a long elliptical shape with a ball attached. Stevens argues that this object was misleading and argues that the video went beyond illustrating Shaibani's testimony. He maintains that the video was used to explain Shaibani's theory that Casey could not have fallen down the stairs and was irrelevant and misleading as none of the four objects simulate a human body. Thus, according to Stevens, the district court erred in admitting the video.

This court reviews questions of the admissibility of evidence using a mixed standard of review. Whether the evidence is relevant is a matter of law and is subject to free review. *State v. Field*, 144 Idaho 559, __, 165 P.3d 273, 283 (2007). The district court's determination of whether the probative value of the evidence outweighs its prejudicial effect is reviewed for an abuse of discretion. *State v. Page*, 135 Idaho 214, 219, 16 P.3d 890, 895 (2000). This Court has adopted a three part test for determining whether the district court abused its discretion: (1) whether the court correctly perceived that the issue was one of discretion; (2) whether the court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether it reached its decision by an exercise of reason. *Sun Valley Shopping Ctr., Inc. v. Idaho Power Co.*, 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991).

Turning first to the issue of relevance, Stevens argues that the video is irrelevant because it did not accurately depict any issues in the case. Accuracy, however, is not the standard governing relevance of illustrative evidence; rather, the illustrative evidence must only be relevant to the witness's testimony. *See State v. Raudebaugh*, 124 Idaho 758, 764, 864 P.2d 596, 602 (1993).

This is particularly true when the events surrounding a death are in dispute. Stevens argues that because the evidence did not show from exactly what point on the stairs Casey fell, the video showing objects falling from the top of the stairs was inaccurate. This ignores the fact that the purpose of Shaibani's testimony was to support the State's theory and discredit Stevens's theory. This argument also presupposes that the exhibit was admitted as substantive evidence. Shaibani could not be required to testify as to the accuracy of Stevens's account; he would have no knowledge of this. Moreover, Stevens, the only possible eye witness, maintained that he was asleep during Casey's fall; thus, to argue that the analysis could be introduced only if based on

3

the exact point from where Casey fell, which according to Stevens is unknown, would make it impossible for the State to rebut Stevens's version of the events.

Shaibani's testimony explaining that Casey's injuries could not have resulted from a fall was relevant and admissible. Admissible evidence is "relevant to a material and disputed issue concerning the crime charged." *Field*, 144 Idaho at __, 165 P.3d at 283. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." I.R.E. 401; *see also Raudebaugh*, 124 Idaho at 764, 864 P.2d at 602. Whether a fact is material is determined by its relationship to the legal theories presented by the parties. *State v. Yakovac*, 145 Idaho 437, ___, 180 P.3d 476, 482 (2008).

The video was relevant and admissible as it was used to illustrate Shaibani's testimony. Here, Stevens's defense was that Casey's injuries were caused by his falling down the stairs and landing on the hardwood floor at the bottom. The issue for the jury to determine was whether Stevens caused Casey's injuries and death. Therefore, whether it was possible for Casey's injuries to have come from such a fall, as Stevens claimed, was a material issue to the case. The video was illustrative of Shaibani's testimony, and Shaibani testified that he used the video to understand the principles involved and in his analysis of whether Casey's injuries could have come from a fall down the stairs.

Turning next to the issue of whether the probative value of the video is outweighed by its prejudicial effect, Stevens argues the video was misleading and confusing to the jury and was of only limited probative value as it did not accurately depict Casey's fall. Once again, this argument assumes that the issue before the jury was the accuracy of the video, not whether Casey's injuries could have come from a fall, as Stevens claimed. Here, the court correctly recognized the issue for the jury, and did not abuse its discretion in admitting the video.

The district court admitted the video for illustrative purposes only after hearing both the foundation for the video, including that it was for demonstration only, and Stevens's objection that the video was not illustrative or accurate. This decision was within the bounds of the court's discretion and consistent with applicable legal standards. Stevens's arguments fail to show the prejudicial effect of the video outweighed its probative value, particularly in light of the limiting instruction given by the district judge immediately after the admission of the video and before

4

the video was played for the jury. Therefore, we affirm the decision to admit the video for illustrative purposes.

**B. The district court did not err in denying Stevens's motion for a new trial.**

Stevens argues the district court erred in denying his motion for a new trial based on newly discovered evidence. Stevens asserts that he should have been granted a new trial because (1) newly discovered evidence about the dangers and effects of Propulsid, a drug Casey was taking at the time of his death, was material, (2) evidence that Casey's eyes were removed after embalming could not have been discovered with due diligence, and (3) Shaibani's false testimony as to his credentials affected his credibility. Additionally, Stevens argues that the cumulative effect of these errors entitles him to a new trial.

A trial court may grant a new trial, on the defendant's motion, in the interest of justice. I.C.R. 34. Idaho Code § 19-2406 specifies the permissible grounds for a new trial and authorizes a new trial when the defendant shows that there exists new evidence material to the defense that could not have been produced at the trial with reasonable diligence. I.C. § 19-2406(7). Newly discovered evidence warrants a new trial only if the defendant demonstrates: (1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) the evidence is material, not merely cumulative or impeaching; (3) it will probably produce an acquittal; and (4) failure to learn of the evidence was not due to a lack of diligence on the part of the defendant. *State v. Drapeau*, 97 Idaho 685, 691, 551 P.2d 972, 978 (1976). The denial of a motion for new trial is reviewed for an abuse of discretion. *State v. Hayes*, 144 Idaho 574, ___, 165 P.3d 288, 291 (Ct. App. 2007).

A motion for a new trial based on newly discovered evidence involves questions of both fact and law. An abuse of discretion will be found if the trial court's findings of fact are not supported by substantial evidence or if the trial court does not correctly apply the law. *See Fullmer v. Collard*, 143 Idaho 171, 173, 139 P.3d 773, 775 (Ct. App. 2006). "Motions for a new trial based on newly discovered evidence are disfavored and should be granted with caution, reflecting the importance accorded to considerations of repose, regularity of decision making, and conservation of scarce judicial resources." *Hayes*, 144 Idaho at __, 165 P.3d at 291.

1. Propulsid

At trial, evidence was introduced that at the time of his death, Casey was taking Propulsid to treat his acid reflux disorder and was also taking the antibiotic, Zithromax. After trial, it came

to light that Propulsid could cause cardiac arrest, edema and other symptoms. Stevens then moved the trial court for a new trial, arguing that this newly discovered evidence could explain why Casey fell as Stevens slept and would likely produce an acquittal. The district court denied this motion. It concluded that although the evidence about Propulsid's side effects was newly discovered,[1] it was not material evidence likely to produce an acquittal.

The court noted that the only evidence presented at trial was that Casey's death was caused by a skull fracture.

> There is no question that the massive skull fracture suffered by Casey could have caused his death. He suffered a fracture to the occipital bone, which forms the back part of the skull and the base of the cranium. In the center, underside of the cranium, there is a large opening called the foramen magnum, through which nerve fibers from the brain pass and enter into the spinal cord. The fracture extended eight centimeters vertically from the occiput (back of the head) downward to the foramen magnum. It was a complex (zig-zag) fracture 2 ½ centimeters wide as opposed to a linear fracture. It takes a lot more force to produce a complex fracture than it does to produce a linear fracture. The fracture was located in the toughest part of the skull, because the occipital bone is thicker than other parts of the skull and is protected by muscles and tendons in the neck that attach to it. The fracture was a third to a half of the circumference of Casey's skull and would have resulted in immediate symptoms.

The court recognized that the issue for the jury was whether Casey's skull fracture was caused by a fall down the stairs or by Stevens battering him. The jury was presented with Stevens's theory that Casey fell down the stairs while Stevens slept. Nonetheless, the jury concluded the injuries were caused by Stevens; thus, offering new evidence to explain why Casey may have fallen in the first place would not probably produce an acquittal. Instead, the only way for the evidence to be material evidence likely to produce an acquittal was if it were to show that sometime after the trauma that caused Casey's skull fracture but before he died from that trauma, Casey had a heart attack from taking Propulsid, which in turn caused the edema and his death. None of the evidence Stevens presented to support his motion for a new trial shows that Casey actually died from these side effects of taking Propulsid.

Here, the district court did not abuse its discretion. It noted that the decision to grant a motion for a new trial was discretionary. The court's conclusions are supported by evidence presented at trial and in the briefing on the motion for a new trial, and the court correctly applied the law to the facts. The court recognized that the jury was presented with a question as to what

---

[1] The parties are not appealing this determination.

6

caused the massive and fatal skull fracture Casey suffered and was presented with two alternate theories. That one theory—Casey fell down the stairs—may now have additional support does not mean that the supporting evidence is material. The jury rejected this theory and determined that Stevens's actions caused Casey's injuries. As the trial court reasoned, the newly-discovered Propulsid evidence is not material nor is it likely to produce an acquittal. Thus, we hold that the district court did not abuse its discretion and affirm its order denying Stevens a new trial based on the Propulsid evidence.

### 2. Removal of Casey's eyes

At trial, expert witnesses testified that the combination of macular folding, perineural hemorrhages and the severity, frequency and locations of retinal hemorrhages in Casey's eyes were indicative of shaken baby syndrome. After trial, an investigator for Stevens's public defender contacted a prosecutor in the case and raised the issue of whether Casey's eyes were removed before or after his body was embalmed. The prosecutor then had a detective investigate this issue. This detective found that most people could not remember when Casey's eyes were removed, but the Mortuary Embalming Report showed that the person who performed the embalming noted Casey's eyes were brown. This evidence suggests that Casey's eyes were removed after his body was embalmed because to make this observation Casey's eyes had to be in his body. Stevens then moved for a new trial, arguing that the embalming fluid and post-embalming removal caused some of the injuries to Casey's eyes. In support he presented the affidavits of three experts who examined evidence presented at trial and concluded that the macular folding and retinal hemorrhaging were caused after Casey's death.

The district court denied Stevens's motion. It determined that this evidence was not newly-discovered evidence. It found that Stevens was aware of the issue earlier and there was "no showing that the embalming report could not have been obtained prior to trial with the exercise of due diligence." Additionally, the court concluded that the expert witness affidavits submitted with Stevens's motion all contained opinions based on a review of evidence which was available prior to trial, that this testimony could have been discovered prior to trial, and that this testimony was simply a different interpretation of existing evidence.

Once again, the district court did not abuse its discretion. Substantial and competent evidence in the record supports a conclusion that the primary evidence that Casey's eyes were removed after embalming—the Mortuary Embalming Report—was available before trial. It also

supports a conclusion that the affidavits Stevens presented did not contain new evidence, but only new interpretations of existing evidence. The record also supports that Stevens was aware the State would use expert witness testimony about injuries to Casey's eyes to support its theory that Stevens killed Casey during a battery. Having determined the district court's findings are not clearly erroneous, we turn to the issue of whether it correctly applied the law to the facts found.

In order to be newly discovered evidence, the evidence itself, not just importance or materiality of that evidence, must be unknown and unavailable prior to trial. *State v. Weise*, 75 Idaho 404, 410, 273 P.2d 97, 100-01 (1954). The fact that the defense did not inquire about the report until well after the trial does not make this report newly discovered. Likewise, that Stevens failed to present his own experts' opinions at trial does not make the evidence on which they rely newly discovered. At most, Stevens has demonstrated that he did not recognize the importance or materiality of the Mortuary Embalming Report. As such, he has not presented any newly discovered evidence within the meaning of I.C. § 19-2406(7) and is not entitled to a new trial based on newly discovered evidence.

Based on the evidence presented, the district court correctly applied the law. It recognized that a defendant wishing to gain a new trial based on newly discovered evidence must show that the evidence meets all four of the requirements set out in Idaho law.[2] It then properly concluded that Stevens had failed to show the first requirement—the evidence was newly discovered. While the district court also examined the due diligence factor, we need not analyze that or the other two factors as all four factors must be present in order to grant a defendant a new trial. *See Drapeau*, 97 Idaho at 691, 551 P.2d at 978. We hold, therefore, that the district court did not abuse its discretion when denying Stevens's motion for a new trial based on evidence regarding the removal of and injuries to Casey's eyes.

3. Shaibani's testimony

---

[2] In *Drapeau* this Court set out the four requirements: "(1) that the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) that the evidence is material, not merely cumulative or impeaching; (3) that it will probably produce an acquittal; *and* (4) that failure to learn of the evidence was due to no lack of diligence on the part of defendant." 97 Idaho at 691, 551 P.2d at 978 (emphasis added). We adopted this test from *Wright's Federal Practice and Procedure* after noting it comported with the approach we had taken in the past. *Id.* (citing *State v. Davis,* 6 Idaho 159, 53 P. 678 (1898); *State v. Bond*, 12 Idaho 424, 86 P. 43 (1976); *State v. Cook*, 13 Idaho 45, 88 P. 240 (1906); *State v. Fleming*, 17 Idaho 471, 106 P. 305 (1910) *State v. Lumpkin*, 31 Idaho 175, 169 P. 939 (1917); *State v. Weise*, 75 Idaho 404, 273 P.2d 97 (1954); *State v. McConville*, 82 Idaho 47, 349 P.2d 114 (1960)).

At trial, Shaibani testified that he had been a clinical professor of physics affiliated with Temple University for about seven years. He also testified that he had published "50 or so" articles and that those had been peer reviewed. After trial, Stevens made a motion for a new trial based on the falsity of these statements. On appeal, he asserts that because Shaibani's testimony was used to show Stevens's claim that Casey fell down the stairs was impossible and used to rebut Stevens's expert witness' testimony, the "newly discovered evidence that Shaibani committed perjury requires a new trial in the interest of justice."

In deciding Stevens's motion, the district court concluded that Shaibani's testimony about being affiliated with Temple University for seven years "was not accurate" and was "untrue." The district court concluded, nonetheless, that this was not material, as it had nothing to do with his qualifications to testify, and also was not newly discovered evidence. It noted that Stevens's defense had received a copy of Shaibani's resume over a year before he testified and the error in Shaibani's testimony was readily apparent from the resume. The district court also concluded that Stevens failed to establish that Shaibani's statements relating to the number of peer reviewed articles he published were false, as peer review applies to both articles published in journals and papers presented at conferences.

On appeal, Stevens claims that the district court found that Shaibani did not lie about his credentials. This assertion, however, misconstrues the record. The district court stated that Shaibani had testified falsely and inaccurately about his affiliation with Temple University. The court concluded, nonetheless, that this was not newly discovered evidence and was not material. This conclusion was not an abuse of discretion. On November 18, 1998, the State disclosed Shaibani's resume, which shows he became a Clinical Associate Professor of Physics at Temple in 1995. The record supports the district court's conclusion that a simple glance at Shaibani's resume during the trial would have revealed that he could not have been affiliated with Temple for both the seven years he stated at trial and the three years he stated on his resume. Therefore, we affirm the district court's conclusion that this discrepancy was not newly discovered evidence.

Stevens also argues that the district erred when it accepted Shaibani's assertion that papers he presented also went through a peer review process to conclude that there was no evidence Shaibani had perjured himself. On appeal, Stevens writes: "As to Shaibani's claims of being published, the district court essentially accepted Shaibani's statement that some of the

9

organizations that allowed him to make a presentation engage in some sort of peer review process and found that he did not lie."

At trial, Shaibani testified that he had published "50 or so" articles. Then, when questioned whether his articles had been peer reviewed, Shaibani answered that they had. Later, in response to Stevens's motion for a new trial, the State submitted an affidavit by Shaibani, who testified:

> The peer-review process applies not only to journals by also to conferences held by medical and scientific organizations. It is the understanding of your affiant that all but two of such organizations found among the 56 papers by your affiant employ peer review in one form or another. The peer-review process for the acceptance of a paper for presentation at some conferences is known to be more stringent than that for inclusion of a paper in some journals. The principles of peer review were enacted in more than half of the 56 papers by your affiant.

The district court did not abuse its discretion by determining that Stevens had failed to prove Shaibani lied as to the "50 or so" peer reviewed articles. Its conclusion is supported by Shaibani's affidavit. That there were contradictory affidavits in the record does not show that the district court erred when it determined that Shaibani had not perjured himself. Therefore, we affirm the district court's order denying Stevens's motion for a new trial as to this issue.

4. Cumulative error

Finally, Stevens asserts that under the doctrine of cumulative error, he is entitled to a new trial. The cumulative error doctrine requires reversal of a conviction when there is "an accumulation of irregularities, each of which by itself might be harmless, but when aggregated, the errors show the absence of a fair trial, in contravention of the defendant's constitutional right to due process." *State v. Moore*, 131 Idaho 814, 823, 965 P.2d 174, 183 (1998) (internal quotations and citation omitted).

This Court declines Stevens's invitation to apply the cumulative error doctrine to a motion for a new trial. First, motion for new trials are reviewed for an abuse of discretion, *Hayes*, 144 Idaho at ___, 165 P.3d at 291, and the cumulative error doctrine applies to instances of multiple harmless errors at trial, *State v. Field*, 144 Idaho 559, __, 165 P.3d 273, 286-87 (2007); *Moore*, 131 Idaho at 823, 965 P.2d 183. This Court will not mix these standards of review. Second, in order to apply the cumulative error doctrine, the Court must find at least one harmless error. *See State v. Lovelass*, 133 Idaho 160, 171, 983 P.2d 233, 244 (Ct. App. 1999).

10

Here, Stevens has not alleged any trial errors that are reviewed under a harmless error standard, so the doctrine is inapplicable.

**C. Stevens's sentence is reasonable.**

Stevens argues the district court violated his Fifth and Fourteenth Amendment rights by punishing him for maintaining his innocence. He also argues the district court abused its discretion by erroneously finding he intentionally killed Casey and by sentencing him to a term of fixed life. We will turn first to Stevens's constitutional arguments.

When sentencing Stevens, the district court considered many factors, including the protection of society. It stated: "Obviously protection of society is of primary importance. There is certainly increased risk if the defendant were placed on parole because of his unwillingness to take responsibility in this case."

Stevens asks this Court to revisit a settled area of Idaho law. He maintains, based on cases from other jurisdictions, that allowing the trial court to consider that he maintained his innocence as a factor when sentencing violates his constitutional rights. However, it has long been the law of Idaho that a court may consider a defendant's continued assertion of innocence when evaluating the possibility of rehabilitation. *See, e.g., State v. Grube*, 126 Idaho 377, 388, 883 P.2d 1069, 1080 (1994). While in this instance the district court was speaking to the protection of society factor, it is a logical, inferential step to consider whether a defendant's limited rehabilitative potential will increase the risk to society. Therefore, we hold that the district court did not violate the Fifth Amendment or abuse its discretion by considering Stevens's failure to take responsibility for his actions when fashioning the sentence.

Next, Stevens maintains the district court abused its discretion by sentencing him to a fixed life term. The Court, when conducting its review of a defendant's sentence, considers the entire length of the sentence under an abuse of discretion standard to determine its reasonableness. *State v. Oliver*, 144 Idaho 722, __, 170 P.3d 387, 391 (2007). Where a sentence is within the statutory limits, the appellant bears the burden of demonstrating that it is a clear abuse of discretion. *State v. Hedger*, 115 Idaho 598, 604, 768 P.2d 1331, 1337 (1989). In examining the reasonableness of a sentence, the Court conducts an independent review of the entire record available to the trial court at sentencing, focusing on the objectives of criminal punishment: (1) protection of society; (2) deterrence of the individual and the public; (3) possibility of rehabilitation; and (4) punishment or retribution for wrongdoing. *State v. Cross*,

132 Idaho 667, 671, 978 P.2d 227, 231 (1999). "Reasonableness" of a sentence "implies that a term of confinement should be tailored to the purpose for which the sentence is imposed." *State v. Broadhead*, 120 Idaho 141, 145, 814 P.2d 401, 405 (1991), *overruled on other grounds by State v. Brown*, 121 Idaho 385, 394, 825 P.2d 482, 491 (1992). In deference to the trial judge, this Court will not substitute its view of a reasonable sentence where reasonable minds might differ. *State v. Toohill*, 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct. App. 1982). To show an abuse of discretion, the defendant must show that the sentence, in light of the governing criteria, is excessive under any reasonable view of the facts. *State v. Strand,* 137 Idaho 457, 460, 50 P.3d 472, 475 (2002).

Stevens argues the court's finding that he intentionally killed Casey was an abuse of discretion because it was based on the court's interpretation of the evidence, rather than on the jury's findings, and that finding was then used to justify a fixed life sentence. He also argues the district court abused its discretion by imposing a fixed life sentence in light of mitigating evidence presented by Stevens.

Stevens was charged with felony murder, a crime which lacks a *mens rea* element. Yet, at sentencing the district court found that Stevens had intentionally killed Casey. It stated:

> The murder of Casey in this case was an intentional act by the defendant. It was not accidental. Casey did absolutely nothing to provoke the attack by the defendant. Casey was absolutely helpless and totally unable to defend himself or to escape. He was an 11-month-old baby who weighed 20 pounds and was unable to walk. The defendant's attack upon Casey was brutal.
>
> . . . .
>
> None of us were there that day and none of us saw what the defendant did, but certainly the most likely cause to that skull fracture was the defendant picking Casey up and slamming him with all his might against a hard surface.
>
> . . . .
>
> We know that—it's obvious from the force of the blows and the escalation of the blows, and I think it's certainly—Dr. Brady's hypothesis is certainly reasonable, that the severe blow to the back of Casey's head was the last injury he received that morning. So we know—I think it's from the force, the increasing force of those blows and particularly the amount of force required to deliver the fatal blow, the only reasonable explanation is that at the time the defendant did intend to kill Casey and I find that he did.
>
> . . . .
>
> In determining the appropriate punishment for this type of crime, in my opinion the punishment for the intentional killing without provocation of a helpless human being must reflect the value we place on human life. So I will

sentence you to a fixed period of incarceration of life in custody of the Idaho Board of Corrections . . . .

"Idaho's sentencing scheme requires no [judicial] findings of fact under I.C. § 19-2521." *State v. Stover*, 140 Idaho 927, 931, 104 P.3d 969, 973 (2005). "[A] court is not required to recite or check off the sentencing guidelines [of I.C. § 19-2521] during sentencing, nor is it even required to give reasons for imposing the sentence." *State v. Thomas*, 133 Idaho 682, 688, 991 P.2d 870, 876 (Ct. App. 1999). Nonetheless, judicial fact finding is constitutionally permissible under indeterminate sentencing regimes when "the facts do not pertain to whether the defendant has a legal *right* to a lesser sentence." *Stover,* 140 Idaho at 931, 104 P.3d at 973 (quoting *Blakely v. Washington*, 542 U.S. 296, 309 (2004)) (emphasis in *Blakely*). To impose a fixed life sentence "requires a high degree of certainty that the perpetrator could never be safely released back into society or that the nature of the offense requires that the individual spend the rest of his life behind bars." *Cross*, 132 Idaho at 672, 978 P.2d at 232.

Here, Stevens had no right to a sentence less than life imprisonment. I.C. §§ 18-4003, 18-4004. Thus, it was constitutionally permissible for the court to find facts related to the objectives of sentencing, although it was not mandatory that it do so. Had the court remained silent at sentencing as to its reasons, the record alone would support its imposition of a fixed life sentence. Casey's injuries were extreme, and the amount of force needed to cause the skull fracture he suffered is amazing. Even looking at the mitigating evidence, such as Stevens's lack of criminal records, family support, and neurological disorder, a fixed life sentence is not unreasonable.

Nonetheless, the district court explained the reasons it believed a fixed life sentence was necessary as punishment for this particular crime. It recognized that Stevens showed almost no rehabilitative potential and would be a continuing danger to society if placed on probation. It also noted a desire to fashion a punishment reflecting the value we as a society place on human life. The court's discussion of Stevens's intent was not a finding that he had committed a crime distinct from the one charged and of which he had been found guilty; rather, it was a discussion of the grave nature of the crime and the character Stevens showed by inflicting such extreme injuries on a helpless and innocent child. Once again, the facts and circumstances of this case support the district court's sentencing decision. As such, we hold that the district court did not abuse its discretion at sentencing by discussing Stevens's intent, and we affirm Stevens's sentence.

## III. CONCLUSION

We affirm the district court. The videotape was admissible as illustrative of Shaibani's testimony, and the district court did not err in admitting it for this limited purpose. The district court did not err by denying Stevens's motion for a new trial, and Stevens's sentence was not excessive.

Justices J. JONES and W. JONES, **CONCUR.**

Justice HORTON, **specially concurring.**

I join in the opinion of the Court. However, I write to separately explain my reasons for affirming the district court's denial of Stevens's motion for new trial generally, and more particularly, the conclusion reached in Part II(B)(2) of the Court's opinion relating to the issues presented regarding the claim of newly discovered evidence relating to Casey's eyes.

**I. Standard of review of orders on motions for new trial based upon newly discovered evidence.**

I think that it is important to consider the appropriate standard of review this Court applies to a motion for new trial based upon newly discovered evidence. "'Idaho Code § 19-2406 sets forth the only bases for the grant of a new trial.'" *State v. Christiansen,* 144 Idaho 463, 467, 163 P.3d 1175, 1179 (2007) (quoting *State v. Gomez,* 126 Idaho 83, 86, 878 P.2d 782, 785 (1994)). Idaho Code § 19-2406(7) authorizes a trial court to grant a new trial "[w]hen new evidence is discovered material to the defendant, and which he could not with reasonable diligence have discovered and produced at the trial."

This Court has stated:

[T]he request for a new trial in a post-conviction proceeding based on newly discovered evidence is the same as a motion for new trial subsequent to a jury verdict. [*Rodgers v. State,* 129 Idaho 720, 723, 932 P.2d 348, 351 (1997)] Before a new trial can be granted, and irrespective of the form of the request, new evidence must satisfy the four-part test set forth in *State v. Drapeau,* 97 Idaho 685, 551 P.2d 972 (1976):

A motion based on newly discovered evidence must disclose (1) that the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) that the evidence is material, not merely cumulative or impeaching; (3) that it will probably produce an acquittal; and (4) that failure to learn of the evidence was due in no part to lack of diligence on the part of the defendant.

*Id.* at 691, 551 P.2d at 978.

*Whiteley v. State,* 131 Idaho 323, 326, 955 P.2d 1102, 1105 (1998).

14

This Court has clearly required an applicant for new trial to bear the burden of proving each of the four elements of the *Drapeau* test. *See, e.g., Grube v. State,* 134 Idaho 24, 30, 995 P.2d 794, 800 (2000) ("To be granted a new trial on the ground of newly discovered evidence, a defendant must demonstrate that the newly discovered evidence was unknown to the defendant at the time of trial;  the evidence is material, not merely cumulative or impeaching;  the evidence will probably produce an acquittal;  and the failure to learn of the evidence was due to no lack of diligence on the part of the defendant.").

This Court has consistently followed the standard of review articulated in *State v. Dambrell,* 120 Idaho 532, 543, 817 P.2d 646, 657 (1991) ("Whether to grant or deny a new trial is a discretionary matter for the trial court, and we will review the trial court's decision only to determine if it has abused its discretion."). *See, e.g., State v. Porter,* 130 Idaho 772, 791, 948 P.2d 127, 146 (1997); *State v. Cantu,* 129 Idaho 673, 674, 931 P.2d 1191, 1192 (1997); *State v. Roberts,* 129 Idaho 194, 197, 923 P.2d 439, 442 (1996); *State v. Fields,* 127 Idaho 904, 913, 908 P.2d 1211, 1220 (1995); *State v. Davis,* 127 Idaho 62, 65, 896 P.2d 970, 973 (1995); *State v. Gomez,* 126 Idaho 83, 86, 878 P.2d 782, 785, (1994); *State v. Lewis,* 123 Idaho 336, 352, 848 P.2d 394, 410 (1993).

In *State v. Powell,* 125 Idaho 889, 876 P.2d 587 (1994), this Court first clearly explained that we would apply the now-familiar standard of review for abuse of discretion:

> In determining whether the trial court abused its discretion we employ the three-step inquiry the Court adopted in *State v. Hedger,* 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989).  In doing so, we inquire whether the trial court:
>
> > (1) correctly perceived the issue as one involving the exercise of discretion,
> >
> > (2) acted within the outer boundaries of its discretion and consistently with any legal standards applicable to specific choices it had, and
> >
> > (3) reached its decision by an exercise of reason.

125 Idaho at 891, 876 P.2d at 589.

The "abuse of discretion" standard applies to all instances in which a trial court considers a motion for new trial.  However, Idaho Code § 19-2406 defines seven circumstances in which a new trial may be ordered.  I believe that there is a second level of analysis that is appropriate when reviewing a trial court's findings and conclusions when deciding a motion for new trial.  As it relates to motions based upon Idaho Code § 19-2406(7), the record must demonstrate the trial court's recognition that the motion involves the exercise of discretion, that the *Drapeau*

criteria are applicable to the choices of granting or denying the motion, and that the trial court exercised reason in reaching its conclusion. In addition, in the second level of analysis, I believe that this Court should identify the standard of review governing the underlying *Drapeau* questions addressed by the trial court.

As the Court's opinion correctly notes, the decision whether to grant a motion for new trial based upon newly discovered evidence involves mixed questions of law and fact. It appears to me that the first question, whether "the evidence is newly discovered and was unknown to the defendant at the time of trial," and the fourth question, whether the "failure to learn of the evidence was due in no part to lack of diligence on the part of the defendant," present purely factual issues.[3] As to the trial court's resolution of these issues, I believe that we ought to apply our well-established standard that "[t]he trial court's factual findings will not be overturned unless they are clearly erroneous." *State v. Rogers,* 144 Idaho 738, 740, 170 P.3d 881, 883 (2007) (citing *State v. Conant*, 143 Idaho 797, 799, 153 P.3d 477, 479 (2007)).

I believe that the trial court's resolution of the two remaining questions are more appropriately subject to an abuse of discretion standard. The second question, whether the evidence is material, not merely cumulative or impeaching, appears to be a purely evidentiary question. "When reviewing the trial court's evidentiary rulings, this Court applies an abuse of discretion standard." *Foster v. Traul,* 145 Idaho 24, 28, 175 P.3d 186, 190 (2007) (applying three-step inquiry).

Similarly, the determination of the third question, whether the evidence will probably produce an acquittal, involves the exercise of discretion as it involves a weighing of the

---

[3] In *State v. Lewis,* 123 Idaho 336, 848 P.2d 394 (1993), this Court implicitly recognized the factual nature of the determination of the fourth question. The Court affirmed the trial court's denial of a motion for new trial. The trial court "found, *inter alia*, that Lewis had not acted with due diligence to discover the new evidence…." *Id.* at 340, 848 P.2d at 398. Reviewing this finding, this Court emphasized the facts supporting the trial court's finding:

> Lewis' motion for a new trial was based upon Michael Carver's and Joie Hein's statements concerning the whereabouts of a videotape on the day the alleged conduct occurred between Lewis and the victim. The victim testified that he had watched certain portions of the videotape with Lewis on this day. Subsequent to the trial, Carver and Hein signed affidavits stating that Carver, who was Lewis' roommate, had loaned the videotape in question to Hein, and Hein was still in possession of it on the day the victim testified that he had watched it with Lewis.
>
> ***
>
> As to the diligence question, the court found that while Lewis was in jail prior to the trial, Carver visited Lewis forty-five times, and Hein visited Lewis ten times, and that both Carver and Hein were frequently at the courthouse proceedings relating to Lewis.

evidence. In the past, this Court has noted the weighing process employed by the trial court in the resolution of this question. *See State v. Fields,* 127 Idaho 904, 913-14, 908 P.2d 1211, 1220-21 (1995) (affirming trial court's denial of a motion for new trial); *Powell,* 125 Idaho at 891, 876 P.2d at 589 ("In reaching its conclusion on this aspect of the *Drapeau* analysis, the trial court did not reject the [evidence] or devalue it, but merely weighed it against the evidence presented at trial to determine whether the [evidence] would probably produce an acquittal in a new trial.") This Court has frequently characterized the trial court's weighing of evidence as involving the exercise of discretion. *See, e.g., Stewart v. Stewart,* 143 Idaho 673, 678, 152 P.3d 544, 549 (2007) ("Here, the magistrate judge correctly perceived that he had great discretion in weighing the strength and credibility of the evidence."); *Sheridan v. St. Luke's Reg'l Med. Ctr.,* 135 Idaho 775, 781, 25 P.3d 88, 94, (2001) ("The district judge's determination to discount the testimony of the defendant's expert witnesses was a proper exercise of his discretion in weighing the demeanor, credibility and persuasiveness of the evidence."); *Levin v. Levin,* 122 Idaho 583, 587, 836 P.2d 529, 533 (1992) ("After a review of the record, we are satisfied that the magistrate did not abuse its discretion in weighing the evidence….").

## II. Analysis of issues presented by Stevens's motion relating to Casey's eyes.

As the Court's opinion indicates, Stevens's motion for new trial relied, in part, on evidence suggesting that the injuries to Casey's eyes occurred following his death and were not indicative of "shaken baby syndrome." This evidence consisted of a report by Det. Jim Miller that was prepared following the second trial and affidavits from Drs. Cyril Wecht and Patrick Lantz. Det. Miller's report was created after the prosecutor requested that he follow up on an inquiry from the defense as to whether Casey's eyes were removed after embalming. Det. Miller concluded that "it appears" that Casey's eyes were removed after his body was embalmed. Dr. Wecht reviewed "the medical records, particularly those regarding the condition of the eyes as described by the eye pathology report." Dr. Wecht opined "that the post-embalming removal of the eyes caused the damage to and around the macular and the retinal folds; or at the very least, that such a mechanism of injury could not possibly be ruled out…." Dr. Lantz "reviewed the eye pathology slides of the eyes." Dr. Lantz opined that "[t]he degree of [retinal detachment is not consistent with occurring during life. There is no hemorrhage associated with the retinal folds and detachments."

---

*Id.* at 352, 848 P.2d at 410.

The trial court clearly decided the motion for new trial, as it related to Casey's eyes, on the fourth element of the *Drapeau* test, *i.e.*, "that failure to learn of the evidence was due in no part to lack of diligence on the part of the defendant." As noted in Part I of this special concurrence, Stevens bore the burden of proving this element. The trial court concluded that Stevens failed to prove this fact.

The trial court stated: "The first issue is whether the post-embalming removal of Casey's eyes constitutes newly discovered evidence that could not have been obtained through due diligence. I find that it does not." The trial court noted that Det. Miller's investigation of the issue was prompted by a request from the defense, concluding "[t]here is no showing that the embalming report could not have been obtained prior to trial with the exercise of due diligence." As to the experts' proposed testimony, the trial court stated:

> The most that can be said is that the Defendant has found some new experts to review the tissue slides and photographs, but he has not shown that such opinion testimony could not have been obtained prior to trial through the exercise of reasonable diligence.

The evidence that Stevens submitted in support of his motion did not address two obvious questions: (1) why did the defense wait until after the second trial before inquiring as to when Casey's eyes were removed?; and (2) why didn't the defense procure expert testimony interpreting the tissue slides and photographs in advance of the second trial? There was simply no evidence presented that addressed these subjects. Rather, Stevens submitted that the evidence upon which he relied was not discovered earlier because the State willfully failed to disclose exculpatory evidence. The only evidence supporting this claim was presented by way of the affidavit of Glenn Elam, the defense investigator. His affidavit stated:

> While reviewing the state's discovery, at no time did I see any type of disclosure by the state … indicating that the eyes of Casey Whiteside had been removed after being outside of the state's chain of custody, and after being embalmed. The state's failure to disclose the fact to the defense was a critical omission regarding a key piece of physical evidence….

The trial court rejected Stevens's claim, stating: "The Defendant argues that the State intentionally did not disclose that [sic] the fact that Casey's eyes were removed after the autopsy and/or after embalming. I do not find this argument credible or convincing." There is substantial evidence to support this finding by the trial court. In the absence of any other evidence that would support a conclusion that the evidence relating to Casey's eyes could not

18

have been discovered in the exercise of reasonable diligence, Stevens simply failed to meet his burden of proof as to the fourth element of the *Drapeau* test. Accordingly, I concur in Part II(B)(2) of the Court's opinion.

For the foregoing reasons, I concur with the Court's opinion.

Justice pro tem TROUT **dissents** as follows:

I concur in all of the Court's opinion with the exception of the part analyzing the denial of Stevens' motion for a new trial based on the discovery of evidence related to the removal of Casey's eyes. Because I believe this meets the test for newly discovered evidence and would have been likely to produce an acquittal, I believe the motion for new trial should have been granted and I, therefore, respectfully dissent.

The Court's opinion correctly sets forth the test for granting a new trial based upon the discovery of new evidence. *See State v. Drapeau,* 97 Idaho 685, 551 P.2d 972 (1976). It is the fourth factor, whether "the failure to learn of the evidence was not due to a lack of diligence on the part of the defendant," *Drapeau,* 97 Idaho at 691, 551 P.2d at 978, which is applied incorrectly. The Court concludes that because the Mortuary Embalming Report was available prior to trial, the defendant and his attorneys were not diligent in locating it. This, in effect, completely eliminates the analysis of reasonable diligence or due diligence. In the Court's view, if a piece of evidence was in existence prior to trial, that ends the inquiry. That is not a correct analysis of whether the defendant acted with due diligence in learning of the pertinent evidence.

In testimony at the first trial in this case, the State presented the pathologist from St. Luke's Hospital, Ronald Slaughter, who performed the autopsy on the victim, Casey Whiteside. Dr. Slaughter detailed the steps he took in performing the autopsy, including mentioning pictures of the body and face of the victim taken by the coroner while Dr. Slaughter was doing the autopsy. Specifically, related to Casey's eyes, Dr. Slaughter responded to defense counsel's questions as follows:

> Q. Doctor, did you remove Casey's eyes?
>
> A. I did.
>
> Q. For what purpose?
>
> A. The coroner had me remove them and keep them until they tell [sic] me what to do with them later.
>
> Q. Did you notice or did you inspect those eyes for retinal hernia?

19

> A. Retinal hemorrhages, no, I'm not an ophthalmology pathologist who does only eyes. So I just put them in formalin which is fixative and keeps them preserved and put them in that until I was told what to do with them.

A few minutes later, in response to a question on redirect examination from the State, Dr. Slaughter indicated that he later sent the eyes to be examined by a forensic ophthalmologist in California [Dr. Brooks Crawford].

Eight years later, at the hearing on the defendant's motion for a new trial, Dr. Slaughter testified that he couldn't remember whether he removed the eyes during the autopsy, or at some time later. Thus, his positive and unequivocal testimony at trial was apparently completely wrong. The only evidence that Casey's eyes were not removed during the autopsy comes from the Mortuary Embalming Report, which has a hand written notation in the "description of subject" section on the line following the word "eyes" indicating they were "brown." In denying the motion for new trial, the district court stated there was "no showing that the embalming report could not have been obtained prior to trial with the exercise of due diligence." The Court upholds this decision, again based upon a conclusion that because the embalming report was in existence prior to trial, it could have been found in the exercise of due diligence. That holding disregards the question of whether diligent counsel would have had any reason to look for it.

In *Drapeau,* the Court quoted from *State v. Davis,* 6 Idaho 159, 53 P. 678 (1898) as follows:

> A new trial should never be granted on the ground of newly-discovered evidence when such evidence is merely cumulative, nor when the alleged newly-discovered evidence was easily within the reach of the defendant, and could, with reasonable diligence, have been produced at the trial. To grant a new trial on such grounds would not be subservient to the public good, but would, on the other hand, encourage a careless and loose presentation by the defendant of his defense.

In *U.S. v. Lawhorne,* 29 F.Supp.2d 292 (1998), the district court held:

> Second, it is necessary to determine whether there has been diligence on the part of the defendant. "Diligence" means ordinary diligence, not the highest degree thereof; and diligence usually is determined by taking into account the composite knowledge of the defendant and his counsel.

29 F.Supp.2d at 305.

Ordinary or reasonable diligence certainly contains some notion that defense counsel must have some reason to go looking for the evidence in the exercise of diligence. In the case at bar, there was absolutely no reason for defense counsel to search out an embalming report with one obscure reference to the color of Casey's eyes, given Dr. Slaughter's specific, but wrong, testimony that he recalled removing the eyes during the autopsy, that he placed them in formalin and waited direction from the coroner on what to do with them. Admittedly, the condition of Casey's eyes was a critical piece of evidence relied upon by the State as proof that Casey's head had been violently shaken prior to his death. Neither the State, nor its witness, Dr. Slaughter, gave any indication but that the eyes were removed during the autopsy and held until they could be sent to an expert ophthalmologist. Frankly, even to a lay person, it seems extraordinary that body parts would be examined after they had been embalmed and that no one would think to comment on that. It certainly does not mean that defense counsel lacked reasonable diligence when he accepted Dr. Slaughter's clear statements about how the autopsy was conducted.

The State's theory of the case was that Casey had been violently shaken by Stevens and that the retinal hemorrhaging in Casey's eyes was strong evidence of that. Indeed, Dr. Brooks Crawford, the ophthalmologist to whom Casey's eyes were sent for examination, testified at trial that "I can think of no other way to explain the findings, this constellation of findings that we have here, except for violent shaking. There's no other way to explain it." Thus, evidence that embalming the eyes may have caused the hemorrhaging is critical evidence and could very well have caused the jury to question the State's theory and produced an acquittal. Because I don't think defense counsel lacked reasonable diligence in looking for an embalming report, I respectfully dissent from the Court's opinion.